IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Submitted on Briefs February 1, 2022

IN RE LILY C.

**Appeal from the Circuit Court for Smith County**
**No. 2020-CV-47    Clara W. Byrd, Judge**

_____

**No. M2021-00885-COA-R3-PT**

_____

The Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Elizabeth R.[1] ("Mother") and David C. ("Father") to their child Lily C. ("Child"). DCS alleged that Father was guilty of severe child abuse by, among other things, raping her. As grounds against Mother, DCS alleged (1) abandonment by failure to provide a suitable home for the Child in the first four months following removal; (2) persistence of the conditions that led to the Child's removal; and (3) failure to manifest an ability and willingness to assume custody of the Child. The trial court found that DCS established the alleged grounds for termination by clear and convincing evidence, and that termination of parental rights was in Child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J.,W.S, and W. NEAL MCBRAYER, J., joined.

Michael J. Rocco, Sparta, Tennessee, for the appellant, David C.[2]

Tiffany D. Hagar, Lebanon, Tennessee, for the appellant, Elizabeth R.

Herbert H. Slatery III, Attorney General and Reporter, and Courtney J. Mohan, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

_____

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights in order to protect their privacy and identities.

[2] Attorney Michael J. Rocco filed a motion to withdraw as counsel for Father after completing his appellate brief due to a conflict of interest that subsequently arose, which motion was granted by this Court. The trial court appointed attorney Daniel J. Barnes as substituted counsel for Father, who has been declared indigent.

# OPINION

## I. BACKGROUND

Mother and Father lived together for about thirteen years until Mother decided to leave the marital residence with the Child in late March of 2018. Mother testified that Father had been abusive to her and Child and that she feared for their safety and lives. At that time, Child was ten years old. Mother testified as follows regarding Father's abuse:

> Q. Before the Department became involved, you mentioned that you had been abused by your husband. Had Lily suffered any abuse?
>
> A. Not in front -- well, yeah, in front of me, yes, once.
>
>     \*   \*   \*
>
> A. [Father] comes out of the room and sees [Child], and he's like, Get out of there, just yelling. And then I'm like, I told her to get in there. And then the next thing I know, he threatened to bend her wrist back and break her wrist and cut her, and then picked her up by her shirt collar, slammed her against the back door and started screaming at her. And I told him to stop. And when I told him to stop, he said, If you try to stop me, I will not only hurt her but I will hurt you, hurt myself, and then break the phone to keep you from calling the cops.

After Mother left the marital residence, she briefly resided in several different places over the next few weeks. She stayed with her mother in Lafayette, Tennessee for about three days. She spent a couple of days with a friend in Alabama. Mother also resided in at least two places in Kentucky. As found by the trial court, Mother's "testimony showed that [she] was unsure of who she was with and when or where she was during that time."

Mother left Child with her mother in Lafayette. The maternal grandmother was living with a registered sex offender. The trial court found that Mother "knew that the sex offender lived with the maternal grandmother and left Lily there anyway," and stated, "[t]he Court specifically finds [Mother] not to be credible when she testified that she told the sex offender that he could not stay in the home with Lily and the maternal grandmother." The trial court further found that

> During the time that [Mother] was gone, the maternal grandmother got tired of taking care of Lily. Lily had been left with the maternal grandmother with

2

no money.  The maternal grandmother called [Father's] family to come and get the child.  At that point, Lily was taken back to [Father].

In early April 2018, DCS received a referral with allegations of sexual abuse by Father.  The trial court adopted the findings of fact subsequently made by the Smith County Juvenile Court that adjudicated Child to be dependent and neglected in September 2018, holding them to be established by clear and convincing evidence.  These findings state as follows in pertinent part:

> The Department of Children['s] Services received a referral with allegations of sexual abuse against Child by the [Father], on April 10, 2017 [*sic*][3], which was assigned to Child Protective Services Investigator (CPSI) Candace Clark.  CM Clark spoke with teachers at Child's school that reported that she has been displaying more negative behaviors for the past couple of days and she appears to be sleepier and less engaged than usual.  Child's teacher asked her if she slept well and Child said that she "sleeps with Daddy."  Child's teacher sent her to talk to the school counselor after she made this statement.  Child disclosed to her counselor that her father put his penis in her mouth and made her throw up "pineapples" after he did that.  Child then disclosed to her counselor that her father put his penis in her "peepee hole" and it made her bleed.  When Child returned to class, it was reported that she told her teacher that every night her father puts his fingers in her "peepee hole" and Child made a hand gesture with her fingers making a "jack hammer" motion towards her vaginal area.  Child then disclosed to her teacher that her father's penis would get sick/throw up on her stomach and he would clean her off with a baby wipe and sometimes the bed would be wet too.  The teacher also reported that Child comes to school appearing to be overly medicated on occasion.
>
> Child is reported to be lower functioning and is placed in special education classes at school.  Child is reported to be on the lower end of the Autism spectrum, has a past diagnosis of failure to thrive, and may have a mild intellectual disability.
>
> DCS currently has an assessment case open involving this Child due to [Mother] dropping her off at her maternal grandparents' home where a registered sex offender lives.  The Mother is currently residing in Franklin, Kentucky.  The maternal grandparents called Child's father and paternal grandparents to pick her up.  Child's mother did not leave any clothing,

---

[3] The reference to the year 2017 is probably a typographical error and should be 2018.  There is no suggestion in the record that DCS waited a full year to investigate the referral.

medication, or supplies to take care of Child. Child currently resides with her [Father].

* * *

CPSI Candace Clark along with Deputy Nathan Williams observed the home of the Father on 4/10/2018. There was only a mattress on the floor in the one bedroom shack, and the Father reported that the Child sleeps on blankets in the laundry room area. The bathroom was dirty, and covered in a black substance one would associate with mold. There were bottles of medication lying on the counter in the bathroom within reach of Child. When CPSI entered the bedroom where the Father sleeps, there were multiple bottles of lotions and a bottle of lubricant sitting on the side table and a pack of baby wipes which was consistent with the Child's statement to her teacher. There was also lubricant on top of the refrigerator beside a child's tiara and princess costume which the Child could not reach.

CPSI Clark had to tell the Father and paternal grandmother . . . to schedule the child a doctor's appointment to have her medication refilled due to her being out of most of her prescribed medication. . . .

[Father] verbally agreed to let the child stay with her grandparents for the night and he stay elsewhere until the allegations were investigated. CPSI Clark reviewed the intake paperwork with [Father,] and his mother . . . had to make him focus his attention on the paperwork and away from the cartoons playing on television. CPSI Clark reviewed the intake handbook with [Father] again and he signed all required documents.

Due to the [F]ather being the alleged perpetrator of the sexual abuse [of] the child and the birth Mother living out of state there is no less drastic alternative, but to place the Child in the custody of the Department of Children's Services. DCS has also been unable to make contact with the Mother to discuss the concerns. DCS does not have any further information as to the Mother; however, DCS would continue to have concerns regarding the Mother knowing the mother left the Child in a home with a sexual offender.

(Name of Child in original replaced with "Child" throughout).

Child remained in foster care continuously from April 11, 2018 until the trial. Mother continued moving around, living temporarily with acquaintances or family

4

members in somewhat transient fashion. She testified that in the spring of 2018, she moved in with a man in Kentucky who became her boyfriend after they had known each other about a week. Then Mother moved in with another friend in Kentucky; then with a relative in Portland, Tennessee; then another brief stay with her mom. According to her own testimony, Mother met a man in Lafayette named Dennell in "December of 2018, and we did not get together until 2019, January the 11th." She moved in with Dennell, they got engaged, and she had lived with him until the time of trial in June of 2021. Mother was unable to hold steady employment during the time between losing custody of Child and trial. The trial court found that she "has no legitimate job or income." She had a vehicle during this time, but also admitted that she has never had a driver's license.

Mother testified that while she was in Kentucky, she could have brought Child to live with her but did not. After DCS obtained custody in April, Mother did not visit with Child until August of 2018. In the twelve months from April 11, 2018 to April 11, 2019, she visited with Child only two or "possibly three times."

The trial on the petition to terminate the parents' rights was held on June 9, 10 and 11, 2021. DCS presented the testimony of six witnesses, including Mother and the medical and social work professionals involved in the case. Father did not testify, but he did present the testimony of his mother, sister, and fiancé. Mother did not call any witnesses at trial. The Child's guardian ad litem took the position that DCS "will be able to prove their petition" and that termination of both parents' rights was in Child's best interest.

The trial court ruled that DCS proved Father had committed severe child abuse of Child. *See* Tenn. Code Ann. § 36-1-113(g)(4). Regarding Mother, the trial court held that DCS had established by clear and convincing evidence that Mother had abandoned Child by failure to provide a suitable home, *see* Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(ii); that there was persistence of the conditions that led to Child's removal, *see* Tenn. Code Ann. § 36-1-113(g)(3); and that Mother failed to manifest an ability to assume custody or financial responsibility for Child. *See* Tenn. Code Ann. § 36-1-113(g)(14). The trial court found termination to be in Child's best interest, finding that she has numerous special needs, including educational and medical needs, that Mother cannot meet and that, by all accounts at trial, Child had been generally thriving and happy in her foster placement for the prior three years.

In its final judgment, the trial court expressed concern with Mother's living arrangement with her fiancé Dennell, noting that according to Mother's own testimony, Dennell had been convicted of a felony, had a past of domestic violence, had failed drug screens for hydrocodone and marijuana, and drinks a six-pack a day but "doesn't get shit-faced drunk." The trial court also found Mother and Dennell's "polyamorous" lifestyle to be a concern, citing several exhibits of Mother's Facebook posts in which she solicited

sexual interactions with strangers. One of these posts included a picture of the Child in the background. The court expressly found Mother not to be a credible witness regarding their polyamorous activities and other matters. Mother and Father have both appealed the termination of their parental rights.

## II. ISSUES

The issues presented are whether the trial court erred in finding by clear and convincing evidence that DCS has established the alleged grounds for terminating the parental rights of Mother and Father, and whether the trial court erred in finding termination to be in the best interests of the Child.

## III. STANDARD OF REVIEW

As our Supreme Court has explained,

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013); *see also* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *Id.* (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the

heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.,* 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.,* 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523-24. We give considerable deference to a trial court's findings about witness credibility and the weight of oral testimony, as the trial court had the opportunity to see and hear the witnesses. *State Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006).

7

## IV. ANALYSIS

### A. Father's Severe Child Abuse

Tennessee Code Annotated section 36-1-113(g)(4) provides that a parent's rights may be terminated when he or she "has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against any child."

In his brief, Father states his position on this ground as follows:

Appellant Father is aware that this Honorable Court will review all grounds sustained by the trial court, regardless of whether such ground(s) was raised by Appellant Father on appeal. *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016). Appellant Father has, nevertheless, not appealed the trial court's finding of severe abuse, as such finding was based on a certified adjudication order of the Juvenile Court from the dependency and neglect petition; which was a final order at the time of the termination hearing. *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *5 (Tenn. Ct. App. May 28, 2014, perm. to appeal denied Aug. 22, 2014); *see, also*, Exhibits, Exhibit #6. Accordingly, the finding of severe abuse against Appellant Father in the dependency and neglect case was *res judicata*. *In re Roger T., et al.*, W2014-02184-COA-R3-PT, 2015 WL 1897696, at *11 (Tenn. Ct. App. Apr. 27, 2015, no T.R.A.P. 11 filed).

As recognized and admitted by Father, both the Juvenile Court and the trial court found that DCS established that he committed severe child abuse by, among other things, raping his daughter, who at the time was ten years old or less. We have reviewed and affirm the trial court's ruling terminating Father's rights on the ground of severe child abuse.

### B. Mother's Abandonment by Failure to Provide a Suitable Home

A trial court may also terminate a parent's rights for his or her abandonment through failure to provide a suitable home. Tenn. Code Ann. § 36-1-113(g)(1); § 36-1-102(1)(A)(ii). This form of abandonment occurs when:

(*a*) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a

8

dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

*Id.* § 36-1-102(1)(A)(ii)(*a*)–(*c*).

A court applying this ground "considers whether a child has a suitable home to return to after the child's court-ordered removal from the parent." *In re Adaleigh M.*, No. E2019-01955-COA-R3-PT, 2021 WL 1219818, at *3 (Tenn. Ct. App. Mar. 31, 2021). To terminate parental rights under this ground, the trial court must find "that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B. Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home also requires that "[a]ppropriate care and attention be given to the child," *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016), and that the home "be free of drugs and domestic violence," *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014).

DCS must make "reasonable efforts" to assist the parent by doing more than simply providing a list of service providers. *In re Matthew T.*, 2016 WL 1621076, at *7.

9

"Reasonable efforts is a fact intensive inquiry and must be examined on a case-by-case basis." *In re Aayden C.*, No. E2020-01221-COA-R3-PT, 2021 WL 2420154, at \*7 (Tenn. Ct. App. June 14, 2021) (quoting *In re C.L.M.*, No. M2005-00696-COA-R3-PT, 2005 WL 2051285, at \*9 (Tenn. Ct. App. Aug. 25, 2005)). " 'Reasonable efforts' as defined by the legislature is 'the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family.' " *Id.* (quoting Tenn. Code Ann. § 37-1-166(g)(1)). The Department should utilize its superior resources in assisting a parent to establish a suitable home, but "[its] efforts do not need to be 'Herculean.'" *In re Hannah H.*, 2014 WL 2587397, at \*9 (citing *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015)); *see also In re Matthew T.*, 2016 WL 1621076, at \*7.

In this case, the trial court, primarily focusing on the four-month period from April 12 through August 12, 2018, found that DCS made reasonable efforts to assist Mother to establish a suitable home but that Mother's efforts in this regard were minimal. The trial court stated:

> Kayla Gensemer, the DCS case worker . . . testified that she has been working with this case since April of 2018. Ms. Gensemer has been with the Department since Lily entered custody. Ms. Gensemer testified about the reasonable efforts that she made to reunify Lily with Mother by contacting the mother on April 18, 2018; and April 26, 2018. She contacted Mother May 1, 2018, but Mother's phone was turned off. Ms. Gensemer tried to contact Mother again on May 4; Mother's phone was turned off. She tried to contact Mother on May 8; Mother's phone was turned off. On May 9th, she could not get in touch with Mother. Finally, Mother appeared in court on May 23, 2018. Ms. Gensemer testified to all of the efforts that were made from April 12, 2018 to August 12, 2018 and the Court finds her to be very credible.
>
> \*　　　\*　　　\*
>
> Specifically, the Court finds that, in the relevant four months, Ms. Gensemer reached out to Mother on multiple occasions to inform Mother of child and family team meetings, to develop a permanency plan, to set up visits, to discuss Lily's placement and health, and to inform Mother of the foster care review board meeting. Ms. Gensemer applied for and received funding for a psychological evaluation with an IQ and parenting assessment. Ms. Gensemer sent the permanency plan to Mother's address and email, including the criteria and procedure for termination of parental rights. Ms. Gensemer told Mother about the intake appointment with the senior

psychological examiner for the psychological evaluation. Ms. Gensemer gave Mother the time and location of the appointment [and] discussed the Interstate Compact on the Placement of Children ("ICPC") process with Mother. All of these efforts were made during the relevant four months of April 12, 2018 through August 12, 2018. Mother did not make reciprocal reasonable efforts during the relevant time period.

* * *

Mother did not establish a suitable home[,] did not participate in the permanency plan[,] never obtained verifiable employment[,] would not prepare a budget[, and] required Ms. Gensemer to have the police accompany her any time that she made a visit to the home where Mother lives with Dennell.

(Mother's name in original replaced with "Mother" throughout). The evidence in the record preponderates in favor of the trial court's ruling that DCS made reasonable efforts to help Mother to establish a suitable home.

The trial court found that Mother failed to provide a suitable home for Child, stating as follows:

The Court finds that Mother has demonstrated a lack of concern for Lily to such a degree that it appears unlikely that she will be able to provide a suitable home for Lily at an early date. As discussed above, Mother is at the mercy of Dennell to provide the necessities of life. Mother does not have a job, a home of her own, or transportation. Mother and Dennell engage in polyamorous sex. Mother and Dennell have used Lily's image to advertise for polyamorous sex. Dennell drinks a six-pack of beer every night. Mother cannot provide for her own needs, and she cannot provide for Lily's needs either.

(Mother's name in original replaced with "Mother" throughout).

Regarding Mother and Dennell's online solicitation of sex with strangers, she testified:

Q. Do you know what polyamorous means?
A. Yes.
Q. Would you explain what that means?
A. It's where couples can, are willing to have multiple partners.

A. Yeah. I've been in the lifestyle for years.  It's just --
Q. So, you and [Dennell] are polyamorous?
A. Yes.
Q. How do you find other participants for your polyamorous sex?
A. We just -- friends, friends of friends. We have friends that are that way.

*    *    *

Q. Do you know what that is?
A. That's my Facebook page.
Q. Who's in the, who's the child in the background?
A. That's my daughter.
Q. That's Lily?
A. Yeah.
Q. And who's that in the foreground, is that you?
A. Yeah.
Q. And what's the caption on that picture?
A. Says −
Q. What's it say?
A. Engaged, polyamorous, seeking friends and fun.

Another online post by Mother in evidence said, "polyamorous male/female couple looking for friends with benefits."  A third featured a picture of Mother wearing "nothing" that she testified "was taken by my fiancé."

When Mother was asked about the potential risks to Child her lifestyle choices might present, she testified:

Q. Do you think it poses a danger to Lily to advertise for strangers to come to your home and have sex?
A. If it, they're strangers, yes, but the ones that come over aren't strangers.
Q. Well, what do you consider not a stranger?  'Cause you considered a guy that you'd known for two weeks boyfriend well enough that you'd live with him.  So, what do you consider a stranger?
A. Stranger is somebody you meet that day.
Q. Oh. So, if you meet them on the app and, and then met up with them the next day, they're not a stranger --
A. No.

Q. -- anymore, right?
A. No.

Shortly after this testimony, Mother stated that she and Dennell decided to stop their polyamorous activities; but later in the trial, she made these statements that sound more like a defense than a denial:

Q. Do you think it's good for a child to know that a stranger's coming to have sex with her mom and her mom's boyfriend off the Internet?
A. Kids --
Q. That's wholesome?
A. I mean, it's not wholesome for the child to know what's going on, but at any given day, you can't tell me at the end of the day, you have a child in your home, you don't go in your bedroom and have sex with your husband. Or whoever. You can't say you don't do that.
Q. Okay.
A. While the kid is in the home, they're asleep, you can't say you don't do it. Everybody does. I mean, there's people out there that goes and have sex while their kids are awake, running around in the room with nobody watching them.
Q. Okay.
A. What I do and he does is not illegal. What we do, we do behind closed door while our kids are not at home or asleep.

* * *

Q. So, you don't see anything wrong with what you're doing, right?
A. Nobody does. . . . You're badgering me how I live my lifestyle because of my kid, which she went through with her father, when I went through the same thing. Do you ever think about that? No, y'all don't. Y'all think that because of what I do, it's going to be harmful to my child. It's not going to be harmful to my child if I protect her.

John Crody, a licensed professional counselor who provided treatment and parenting education to Mother, testified that a "big glaring [concern] is advertising or – I don't know what the term is, whatever, seeking, the face of a child in a background, that, that is really weird." Mr. Crody stated:

Q. Do you think she, that [Mother] has the, the insight to recognize that she shouldn't be putting her child's picture in something like that?
A. No, I don't think it even occurred to her.

13

Q. Is that a problem?
A. That could be a problem.
Q. Is that a safety concern?
A. It's a safety concern, and it, it creates a higher risk of, of further and re-abuse, not to mention trauma.
Q. And the fact that one of those posts mentioned that the people need to be able to travel to them, does that give you cause for concern?
A. Yeah, people, strangers in and out of the house, people that we don't know.
Q. Does that heighten the risk factor?
A. Of course.

Based on our review of the evidence presented, we agree with the trial court's determination that Mother has made decisions that place her in a position of near-total dependency upon her fiancé and that her living circumstances would pose substantial and unacceptable risks to Child if she were to live there. As for Dennell, there is not a large amount of information in the record about him beyond Mother's own testimony as quoted in parts above, but what is in there is concerning to this Court, as it was to the trial court. Dennell decided not to make himself available to present his perspective for the trial court to see and hear. We affirm the trial court's decision terminating Mother's parental rights on the ground of abandonment by failure to provide a suitable home.

### C. Persistence of Conditions

Tennessee Code Annotated section 36-1-113(g)(3)(A) provides that a person's parental rights can be terminated when:

The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A). The purpose of the persistent conditions ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Navada N.*, 498 S.W.3d 579, 605 (Tenn. Ct. App. 2016). Consequently, "[t]he failure to remedy the conditions which led to the removal need not be willful." *Id.* (citing *In re T.S. and M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000)). Even if not willful, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *Id.* (citing *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)).

> The trial court found as follows regarding persistent conditions:
>
> the conditions that led to Lily's removal still exist, or other conditions exist that, in all reasonable probability, would cause Lily to be subjected to further abuse or neglect, preventing Lily's safe return to Mother. Specifically, Mother has no transportation, no job, and no stable and appropriate home. Mother has lived with Dennell for two and a half years, but she lives with him at his will. Mother has to do what Dennell tells her to do, including having sex with strangers to keep him from cheating on her. The Court finds that Mother cannot protect herself[,] much less protect Lily. Mother has been abused by [Father] and other men who have been in and out of her life. She let people into her apartment in Kentucky and did not even know their last name. Mother had not known Dennell for a month before she moved in with him. Mother and Dennell engage in polyamorous sex with strangers. Dennell drinks a six-pack of beer every night. Mother and Dennell have not allowed an unannounced visit to their home.
>
> Given that Mother has lived with Dennell for two and a half years and has not gained employment or housing of her own, there is little likelihood that these conditions will be remedied at an early date. Mother testified that she and Dennell no longer engage in polyamorous activities, but her testimony is not credible. Even if the Court were to credit her testimony on this matter, the Court finds that to be too little, too late. Additionally, Mother is not capable of parenting Lily. Mother lacks empathy.

(Mother's name in original replaced with "Mother" throughout).

15

The conditions that set this case in motion were Mother's decision to leave Child with the paternal grandmother without Child's medicine, clothing, or other necessities. This decision led to Child's rapid return to Father and her horrific abuse and neglect at Father's hands. Mother was without a stable job, income, reliable and lawful transportation, and an appropriate place to live. These conditions persisted, and Mother only saw Child two or three times in the following year. Mother did not cooperate with DCS's efforts to help her, often refusing to communicate with the caseworker.

Most, if not all, of these conditions had persisted through the time of trial. The discussion above regarding Mother's internet solicitation of group sex with strangers, and potential risks to Child if she were to be returned to Mother's custody, is also pertinent and applicable here. Although Mother testified that she has worked a string of short-term, low-wage jobs, none of which for very long, she provided no documentation or other evidence of employment, and the trial court expressly discredited her testimony in this regard. Her ability to transport herself legally remains seriously hampered by never having obtained a driver's license. When Mother was asked at trial whether she accepted any responsibility for Child's placement in foster care, she said, "I didn't do anything wrong at all, 'cause everything I did, I did responsibly." We affirm the trial court's decision that after three years, Mother remains incapable of providing for Child's needs as a parent, and there was no likelihood of Child's safe and secure return to Mother's custody.

### D. Failure to manifest an ability and willingness to assume custody

Tennessee Code Annotated section 36-1-113(g)(14) provides an additional ground for termination when

> [a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires clear and convincing proof of two elements. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* (citing Tenn. Code Ann. § 36-1-113(g)(14)). The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

16

As to the first element, our Supreme Court has held that the statute requires "a parent to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *See In re Neveah M.*, 614 S.W.3d 659, 677-78 (Tenn. 2020) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280 at *13 (Tenn. Ct. App. June 20, 2018)). Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

Regarding the second element of this ground, whether placing the child in the person's custody would "pose a risk of substantial harm to the physical or psychological welfare" of the children, we have previously explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Greyson D.*, No. E2020-00988-COA-R3-PT, 2021 WL 1292412, at *8 (Tenn. Ct. App. Apr. 7, 2021) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)) (footnotes omitted).

The trial court found that Mother failed to manifest both the ability and willingness to assume custody of Child. In reviewing these findings, we bear in mind that "manifesting an ability and willingness to assume legal and physical custody of a child must amount to more than mere words." *In re Ken'bria B.*, No. W2017-01441-COA-R3-PT, 2018 WL 287175, at *10 (Tenn. Ct. App. Jan. 4, 2018). The trial court found as follows regarding this ground for termination:

> Mother does not have a suitable home for Lily [and] cannot provide for Lily financially or otherwise. Not only does Mother lack any form of income, but she also lacks empathy and is unfit to parent. The Court finds that placing Lily in the legal and physical custody of Mother would pose a risk of substantial harm to the physical or psychological welfare of Lily. Mother and Dennell engage in polyamorous sex with strangers. That environment is not conducive to a stable and safe environment for a victim of sexual abuse. It is a very real risk to put a child into an environment where there is substance [abuse] and risky sexual activity happening. Lily has many needs

17

due to her autism, mild mental disability, bipolar disorder, and her past failure to thrive.  Lily needs a caregiver who can be nurturing and attentive to her.  Mother's lack of empathy would be particularly detrimental to Lily.

These findings are supported by the evidence in the record.  Tara Tomlin, one of Child's caregivers who coordinates her services and works with Child on treatment goals, testified that she meets with Child "a minimum of twice per week."  Regarding Child's special needs, Ms. Tomlin stated,

Q.  What kind of things does Lily require from a caretaker?
A. There's a lot of different things.  She has, she's on quite a few different medications.  She has to have the medication evaluation no less than one time per month, sometimes even more.  She has to go to the doctor regularly.  She has an individual education plan and that's due to her autism and her needs, you know, and the educational environment.  Those have to be updated no less than once per year.  So, she has a lot [of] different, both emotional, educational, and medical needs to look after. . . . She also has therapy.  That's another thing to add.  Once weekly and that has helped her tremendously.
Q. Does she have a lot of appointments every week?
A. Yes.

Mother's therapist, Mr. Crody, testified that in his opinion Mother would not be able to provide for and meet Child's special needs.  Although Mother made significant efforts in attending numerous therapy and parenting sessions with Mr. Crody, she had not yet completed the parenting class program by time of trial.  Mr. Crody testified that Mother still struggles with inattention, a lack of empathy, lower cognitive function, and delusional thinking, in that "[s]he just doesn't have a realistic view of the world and her expectations of others is unreasonable" and "she does carry a lot of false beliefs about the way the world works, about how people get along."  Mother herself testified that she suffers from epilepsy, vertigo, a learning disability, memory loss from a childhood head injury, depression, PTSD, and "I can't remember - what all I got diagnosed with other than that.  I've no – I've gotten a lot of stuff going on with me."

Mr. Crody testified that Mother still does not accept any responsibility for Child's situation and the events that resulted in her three-year stay in foster care.  When he was asked about whether Mother had made significant progress over the course of therapy, he stated, "No.  I had concerns about the duration of time.  I mentioned in the report that there were, my reasons for that."  Mr. Crody discussed his concerns with Mother's lack of income and employment, dependency on Dennell, and risks to the Child posed by her choices, as has been discussed already above at length.  His bottom-line conclusion was

that Mother was unable and "not ready" to parent Child. We affirm the trial court's decision that DCS has established the statutory ground of failure to manifest and ability and willingness to assume custody.

## E. Best Interests of Children

In addition to proving at least one statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is in the children's best interests. *See* Tenn. Code Ann. § 36-1-113(c). "[A] finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). This is because our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The focus of the best interest analysis is not the parent but the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective."). Our General Assembly has provided that "[i]n all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child." Tenn. Code Ann. § 36-1-101(d).

At the time DCS filed its petition, Tennessee Code Annotated section 36-1-113(i) provided nine factors[4] for analyzing best interests:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

---

[4] Our legislature subsequently amended the best interest factors at Tenn. Code Ann. § 36-1-113(i). The most recent version of the statute includes twenty enumerated factors and became effective on July 1, 2021.

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

This list is non-exhaustive. *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 877).

Father has appealed the ruling that termination of his parental rights is in the Child's best interest. The point that termination of the parental rights of a father who has sexually abused and raped his child is in that child's best interest does not need much further discussion or elaboration. DCS case worker Gensemer testified that Child is scared of Father and has nightmares about him. We have reviewed Father's claim in light of the nine statutory factors enumerated above. None of the them weighs in favor of reversing the trial court's decision that termination is in Child's best interest. The evidence does not preponderate against the trial court's conclusion that Father did not make "any adjustment of circumstances, conduct, or conditions to make it safe and in Lily's best interest to be in [his] home." Regarding factors (3) and (9), there is no suggestion in the record that Father has maintained regular contact with or supported the Child. Regarding factor (4), the evidence does not preponderate against the trial court's finding that a meaningful relationship has not been established between Father and Child. Regarding factor (6), it

has been demonstrated that Father has shown brutality, physical abuse, sexual abuse, emotional and psychological abuse, and neglect toward Child. As will be discussed further below, it is clear that a change of caretakers and physical circumstances would be severely detrimental to Child's well-being. We affirm the trial court's decision in this regard.

In this case, as already discussed at length above, Mother has not made an adjustment of her living conditions that would make it safe for Child to return to her custody. In the roughly three years between removal of Child and the trial, Mother's visitation has been relatively minimal. We have already noted there were only two or three visits in the first year. Care coordinator Tomlin testified that thereafter, Child was refusing telephone and videoconferencing visits with Mother when she was supervising them. Once in-person visits resumed after the pandemic subsided, Mother and Child had supervised visitation of a single two-hour visit per month. Consequently, the trial court found that "Lily does not have much of a relationship with Mother and does not seem to want a relationship with Mother." The evidence does not preponderate against this conclusion, which weighs in favor of termination of Mother's parental rights.

The trial court found Mother's professional counselor and psychotherapist Mr. Crody "to be a very credible witness" and credited his opinion that Mother had a serious parenting problem stemming from her "absence of empathy, by which she is unable to put herself in [Child's] shoes." Mr. Crody's testimony made it clear that Mother was not equipped for, or capable of, safely and effectively parenting Child.

The evidence also supports the trial court's findings that "Lily has bonded with her foster siblings and is doing well in the foster home. She is making good grades. She wants to be adopted. Lily is 13 and happy where she is, and really wants to stay there." Care coordinator Tomlin testified as follows in this regard:

Q. How often do you meet with Lily?
A. A minimum of twice per week.
Q. And this has been happening since March of last year?
A. It sure has.
Q. Have you been able to see her in her foster home?
A. Yes.
Q. How is she, how does she interact in her home?
A. Well, really, really good. She has a good connection and bond with everyone in the home, including the foster mother.
Q. Does she seem happy?
A. Yes.
Q. Does she seem comfortable there?
A. Absolutely.

Q. Does she have her own bed and her own things there?
A. Her own stuff.  She's got it decorated in unicorns, which is her favorite.

*　　*　　*

Q. Is Lily progressing in her foster home?
A. Yes.
Q. How has she done -- can you just tell us what kind of child Lily is as opposed to what kind of child she was when you first met her?
A. Yeah.  She's very, very outgoing.  She's able to be redirected a lot easier now.  She's learned to do things in a different way.  But she's on the honor roll, she can express her emotions and feelings successfully now[.]

Thus, as the trial court correctly found, "[a] change of caretaker and physical environment is likely to have a negative effect on Lily's emotional, psychological and/or medical condition."  We affirm the court's conclusion that termination of the parental rights of Mother and Father is in the Child's best interest.

## V. CONCLUSION

The judgment of the trial court is affirmed.  Costs on appeal are assessed to the Appellant, Elizabeth R., for which execution may issue, if necessary.

_____
KRISTI M. DAVIS, JUDGE